UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

Nº 07-CV-4380 (JFB) (ETB)
_____

HOMEFRONT ORGANZIATION, INC., LETTIERI DEVELOPMENT, INC., QUOGUE
STREET DEVELOPMENT, LLC, AND ROCCO LETTIERI,

Plaintiffs,

VERSUS

GEORGE M. MOTZ, WILLIAM HINES, JEANETTE OBSER, WILLARD BERRIEN,
RICHARD MCCHESNEY, RALPH CONFESSOR, L. RUSSELL HAYES, RICHARD
DEPETRIS, RICHARD VAN DE KIEFT, individually, AND THE INCORPORATED VILLAGE
OF QUOGUE,

Defendants.
_____

MEMORANDUM AND ORDER
July 14, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Homefront Organization, Inc., Lettieri Development, Inc., Quogue Street Development, LLC, and Rocco Lettieri ("Lettieri") (collectively, "plaintiffs") bring this action against George M. Motz ("Motz"), William Hines ("Hines"), Jeanette Obser ("Obser"), Willard Berrien ("Berrien"), Richard McChesney ("McChesney"), Cristina Kepner ("Kepner"), Ralph Confessore ("Confessore"), L. Russell Hayes ("Hayes"), Richard DePetris ("DePetris"), Richard Van de Kieft ("Van de Kieft") and the Incorporated Village of Quogue (the "Village") (collectively, "defendants")[1], alleging due process, equal protection, and first amendment violations pursuant to 42 U.S.C. § 1983. Plaintiffs also allege that defendants engaged in an a conspiracy to interfere with their civil rights pursuant to 42 U.S.C. § 1985.

Defendants now move pursuant to 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiffs' complaint. For the reasons discussed below, defendants' motion is granted under Rule 12(b)(1) on ripeness grounds. The ripeness

_____

[1] Alan Lazarescu was voluntarily dismissed as a defendant in this case by stipulation "So Ordered" on November 27, 2007.

doctrine, which is drawn from Article III, is a cornerstone limitation on judicial power that is designed, among other things, to prevent federal courts from interfering in abstract disagreements among parties or administrative processes that are ongoing, such that the purportedly injured party has not yet suffered a concrete injury that needs to be addressed by the federal courts. This doctrine is especially important in land use and zoning disputes which are quintessential local issues that, with certain limited exceptions, are properly left in the first instance to local bodies that are better equipped than federal courts to address and resolve such issues. This lawsuit, pertaining to an ongoing dispute between real estate developers and the Village of Quogue regarding use of a particular piece of land, falls squarely within the category of cases that are not ripe for judicial review. In particular, plaintiffs' allegations are not ripe for review because (1) the Village has not yet reached a final decision with regard to plaintiffs' applications, either for a variance or with regard to plaintiffs' desire for site plan approval for the commercial building plan; (2) a positive declaration pursuant to the State Environmental Quality Review Act ("SEQRA") is not a final agency decision that is reviewable under New York Law; and (3) the alleged hostility by the Mayor and other defendants to plaintiffs and their proposal is not sufficient in this case to invoke the futility exception.

I. BACKGROUND

A. Facts

The following facts are taken from the complaint and are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to plaintiffs, the non-moving party.[2]

1. The Quogue Property

Homefront Organization, Inc. and Lettieri Development, Inc. are real estate development companies that are in the business of purchasing and developing properties on Long Island. (Compl. ¶ 36.) Lettieri is the president of both Homefront Organization, Inc. and Lettieri Development, Inc. (*Id.* ¶ 37.) In or about December 2005, plaintiffs became interested in commencing a new real estate development project in the Village of Quogue at a site known as the Inn at Quogue (hereinafter, the "Inn"). (*Id.* ¶ 40.)

The Inn is currently operating as an inn, motel, and restaurant, and the property is operating as a pre-existing, non-conforming use. (*Id.* ¶ 42.) The owner of the Inn was Mr. Hilton Smith ("Smith"). (*Id.* ¶ 41.) Plaintiffs allege that at the time of plaintiffs' interest in the property, the structures and the surrounding property of the Inn were, and still are, in a state of disrepair. (*Id.* ¶ 47.) The plaintiffs, who perceived the Inn property as an excellent development project and who desired to restore, revitalize, and rejuvenate

---

[2] As noted *infra*, with respect to the Rule 12(b)(1) portion of defendants' motion, the Court is not required to accept contested jurisdictional allegations in the complaint and may resolve such disputes by resorting to extrinsic evidence outside the pleadings. However, in the instant case for the reasons discussed *infra*, even if all of the allegations in the complaint are taken as true and all reasonable inferences are drawn in plaintiffs' favor (which the Court has done for purposes of this motion), plaintiffs' claims are still not ripe for judicial review and must be dismissed under Rule 12(b)(1).

2

the property, contacted Smith regarding a potential purchase of the Inn property. (*Id.* ¶ 48.) In or about December 2005, Lettieri had an initial meeting with Smith regarding such a purchase. (*Id.* ¶ 49.) On or about October 2006, after numerous meetings and telephone calls, plaintiffs and Smith entered into a contract of sale for the entire Inn property. (*Id.* ¶ 50.) The purchase price was $7,400,000. (*Id.*)

2. Meetings With Mayor Motz

In early September 2006, just prior to the final execution of the contract of sale, Lettieri met with Motz, the Mayor of Quogue, to discuss plaintiffs' intentions and goals with respect to the purchase of the property. (*Id.* ¶ 52.) Plaintiffs allege that, at that meeting, Lettieri requested and welcomed feedback and suggestions from Motz and Hines. (*Id.* ¶ 54.)

Plaintiffs claim that their initial concept with respect to the Inn property was to construct a residential villa and/or condominium development consisting of ten (10) units. (*Id.* ¶ 56.) In late September 2006, Lettieri presented concept drawings for such a project at a second meeting in Motz's office. (*Id.* ¶ 58.) Plaintiffs allege that, after this meeting, Lettieri left the drawings with Motz so that he and Hines could present them to the Village of Quogue Board of Trustees (the "Board"). (*Id.* ¶ 60.) Plaintiffs further allege that Motz informed Lettieri that he would contact Lettieri within a couple of days with regard to the presentation of the drawings to the Board. (*Id.* ¶ 61.)

Plaintiffs claim that Lettieri did not hear back from Motz for over two weeks, even after Lettieri left numerous telephone messages for him that were not returned. (*Id.* ¶ 62.) Lettieri visited Motz's office in or about October 2006. (*Id.*) Plaintiffs allege that at that meeting, Lettieri questioned Motz as to the status of the Inn project and the Board's opinion with respect to the concept drawings, so that Lettieri could move forward with the formal application process. (*Id.* ¶ 63.) Lettieri alleges that Motz was visibly angry, and told Lettieri that his proposed project was "not happening in our town" and that "we are not like *you people* from Westhampton." (*Id.* ¶ 64) (italics in original). Lettieri further alleges that when he asked Motz what plaintiffs would be permitted to do with this property that they have contracted to purchase, Motz responded that no project of the plaintiffs was "happening in our town." (*Id.* ¶¶ 65-66.) He then urged Lettieri and the other plaintiffs to "move on." (*Id.*)

3. The Subsequent Hostility Allegations

In October 2006, plaintiffs proceeded with the formal application process before the Board for the residential condominium project. (*Id.* ¶ 71.) During this time, Lettieri contacted Village Trustee Randy Cardo ("Cardo"), an individual with whom Lettieri had previous business relationships, and asked for his advice as to how the plaintiffs should proceed. (*Id.* ¶ 72.) Plaintiffs allege that Cardo warned Mr. Lettieri to "get out of the deal" because plaintiffs' project was "never going to happen" and Cardo "did not want to see Mr. Lettieri get hurt." (*Id.* ¶ 73.)

Lettieri attended several meetings before the Board, wherein Lettieri informed the Board that everything with respect to his project was up for discussion and he welcomed suggestions from the Board members. (*Id.* ¶ 75.) Plaintiffs allege that, at those meetings, with Motz in attendance, the

3

Board expressed its reservations regarding the change from an inn/hotel to year-round residences such as condominiums or villas, as plaintiffs proposed, as well as other concerns. (*Id.* ¶ 78.)

Plaintiffs allege that Lettieri presented to the Board a revised development plan which was similar in appearance to his original plans in order to satisfy the demands of the Board and reach a compromise. (*Id.* ¶ 82.) Plaintiffs allege, however, that the development would feature residential units that were individually owned, with a provision in the condominium by-laws that the units would be required to be rented out by the owner for six months out of the year, and that the plaintiffs would maintain eighteen (18) year-round hotel rooms. (*Id.* ¶¶ 82-83, 86.)

Plaintiffs allege that Lettieri was informed by Smith, the owner of the Inn, that he was receiving constant pressure from Motz to breach his real estate contract by repudiating the contract and refusing to sell to Lettieri. (*Id.* ¶ 88.) Plaintiffs claim that Smith told Lettieri that Motz contacted Smith on no less than eight (8) separate occasions to dissuade Smith from selling the Inn property to Lettieri. (*Id.* ¶ 89.) Plaintiffs further allege that Motz stated, in substance, that he and the other defendants would not permit plaintiffs to build anything on the Inn property. (*Id.* ¶ 90.) Moreover, plaintiffs claim that Smith informed Lettieri that he was contacted directly by a substitute buyer, Ron Solomon, who was procured by Motz. (*Id.* ¶ 92, 94.) In addition, Lettieri was informed by a lessee of a restaurant called Q Restaurant that when Motz and several Village Trustees were in the restaurant for dinner, Motz declared to the lessee that Lettieri's project would "never get approved." (*Id.* ¶ 95.)

### 4. The ZBA Meetings

Plaintiffs allege that after Lettieri heard from Smith, Cardo, and Motz that none of his projects would ever get approved, Lettieri took his application to the Village of Quogue Board of Zoning Appeals (hereinafter, the "BZA") for a meeting on January 19, 2007. (*Id.* ¶¶ 96-97.) Plaintiffs allege that Motz, Hines, and Trustee Obser were present at this meeting. (*Id.* ¶ 98.)

At the ZBA meeting, Lettieri presented his proposal for the residential condominium development. (*Id.* ¶ 100.) Upon receiving comments and concerns similar to that of the Board with respect to the loss of the inn/hotel, Lettieri reiterated his alternative plan. (*Id.*)

On April 21, 2007, Lettieri attended a second meeting before the ZBA, where plaintiffs' attorney presented the condominium proposal. (*Id.* ¶ 103.) Plaintiffs allege that the plaintiffs' attorney was met with fierce opposition from the Village Attorney, DePetris, including a demand that plaintiffs submit a memorandum of law with respect to the requested variance. (*Id.* ¶ 104.) When plaintiffs' attorney did submit such a memorandum, DePetris allegedly remarked, without even reading it, that "*this* is the memorandum?," and "this doesn't even come close to what I asked for." (*Id.* ¶ 122) (italics in original).

### 5. The Van de Kieft Report

On June 9, 2007, the Village of Quogue Planning Board (the "Planning Board") conducted a public hearing to consider site plan approval for plaintiffs' commercial condominium project. (*Id.* ¶ 108.) The meeting was adjourned for the Planning Board

to wait for the report from Van de Kieft, the Village Engineer, in order to consider plaintiffs' application. (*Id.* ¶ 109.) Another meeting was held on July 14, 2007, but the Planning Board still had not made a determination. (*Id.* ¶ 112.) Lettieri alleges that, when he reminded the Planning Board of their time obligations under SEQRA, one of the members threatened Lettieri that the Planning Board could always issue a "positive declaration," which plaintiffs allege would subject the plaintiffs to significant costs and further delay. (*Id.* ¶ 113.)

At the close of the meeting, Lettieri was promised that Van de Kieft's report would be received within a week. (*Id.* ¶ 115.) After not hearing from Van de Kieft for ten (10) days, Lettieri wrote a letter to Berrien, the Planning Board Chairman, asking for the status of plaintiffs' application. (*Id.* ¶ 116.) Lettieri never received a response to his letter. (*Id.* ¶ 117.) Lettieri alleges that he then called Berrien, who was extremely hostile to him over the phone, but assured Lettieri that he would be receiving the Van de Kieft Report soon. (*Id.* ¶¶ 117-18.) Lettieri never received the report. (*Id.* ¶ 119.)

6. The SEQRA Positive Declaration

The SEQRA, 6 N.Y.C.R.R. § 617, requires local planning boards to consider the potential environmental impact of a proposed project before granting site plan approval. 6 N.Y.C.R.R. § 617.1. If the planning board makes a positive declaration under SEQRA, it means that there is a potential environmental problem and the applicant is required to submit an environmental impact statement, which addresses in greater detail the planning board's environmental concerns. 6 N.Y.C.R.R. § 617.7. A positive declaration is not a rejection of a site plan application. After submission of the environmental impact statement, the planning board will still ultimately approve or reject the application. 6 N.Y.C.R.R. § 617.1(c).

At an August 11, 2007 Planning Board meeting, Planning Board members adopted a "positive declaration" with regard to plaintiffs' application pursuant to SEQRA because of the project's potential adverse effect on the environment.[3] (*Id.* ¶ 125.) The declaration required plaintiffs to submit an Environment Impact Statement ("EIS") for the Planning Board's review. The positive declaration was prepared by Van de Kieft. (*Id.* ¶ 126.) Plaintiffs assert that submitting such an EIS would be futile because Motz already indicated that plaintiffs' proposal was never going to be approved. (*Id.* ¶ 128.)

B. Procedural History

Plaintiffs filed a complaint in this action on October 22, 2007. All defendants, except Van de Kieft, moved to dismiss the complaint on March 6, 2008. Van de Kieft moved to dismiss on March 27, 2008. Oral argument was held on May 23, 2008.

At oral argument and in letters to the Court following oral argument, the lawyers for both sides reported that there are ongoing proceedings before the administrative boards in the Village of Quogue. In particular, the Quogue Village Board had scheduled a public

---

[3] The SEQRA Positive Declaration stated, in relevant part: "The Planning Board has determined that the proposed action described below may have a significant effect on the environment." (SEQRA Positive Declaration, Defs.' Exh. C.)

5

hearing for June 27, 2008, concerning a proposed amendment to the Village Code based upon plaintiffs' revised residential building plan, which consisted of a modification to the plaintiffs' prior residential plan that was pending before the Village Board and the BZA at the time of the inception of this lawsuit.

## II. STANDARD OF REVIEW

The defendants have moved to dismiss both under Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). In reviewing a motion to dismiss under Rule 12(b)(1), the court "must accept as true all material factual allegations in the complaint, but we are not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted). Moreover, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* (citations omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir. 2005).

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 1974.

"A court presented with a motion to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6) must decide the 'jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction.'" *Coveal v. Consumer Home Mortgage, Inc.*, No. 04-CV-4755 (ILG), 2005 U.S. Dist. LEXIS 25346, at *7 (E.D.N.Y. Oct. 21, 2005) (quoting *Magee v. Nassau County Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)); *see also Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (noting that a motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction).

## III. DISCUSSION

### A. Section 1983 Ripeness

As a threshold matter, defendants contend that plaintiffs' Section 1983 claims should be

dismissed because none is ripe for review and, thus, the Court lacks subject matter jurisdiction. The Court agrees.

For claims to be justiciable under Article III, "courts have long recognized that the controversy, as an initial matter, must be ripe." *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 348 (S.D.N.Y. 2000) (citing *Marchi v. Bd. of Cooperative Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999), *aff'd*, 252 F.3d 645 (2d Cir. 2001)); *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998)). Moreover, the Supreme Court has explained that "[r]ipeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49 (1967)).

The Supreme Court has established a two-pronged test to determine whether a claim is ripe for takings-type claims. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 194-95 (1985). The first prong requires that the government entity charged with implementing the regulations in question to have reached a "final decision." *Id.* at 194; *see Honess 52 Corp. v. Town of Fishkill*, 1 F. Supp. 2d 294, 301 (S.D.N.Y. 1998) (finding that the court "cannot determine whether a plaintiff has been deprived of property, arbitrarily or otherwise, until it has a final decision before it"). The second prong requires plaintiffs to have sought compensation through "reasonable, certain and adequate" state provisions for obtaining compensation. *Williamson*, 473 U.S. at 194. Although the ripeness test in *Williamson* involved only a takings claim, the ripeness requirement of *Williamson* has also been extended to equal protection and due process claims asserted in the context of various land use challenges.[4] *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88-89 (2d Cir. 2002) (applying ripeness test to equal protection and due process claims); *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 96-97 (2d Cir. 1992) (applying ripeness test to substantive due process claims); *Country View Estates @ Ridge LLC v. Town of Brookhaven*, 452 F. Supp. 2d 142, 144, 149 (E.D.N.Y. 2006) (equal protection and due process); *see also Goldfine v. Kelly*, 80 F. Supp. 2d 153, 158 (S.D.N.Y. 2000); *Reifler v. City of Poughkeepsie*, No. 96-9604, 1997 U.S. App. LEXIS 17486, at *3-*4 (2d Cir. July 9, 1997); *Kittay*, 112 F. Supp. 2d at 349 n.5.

---

[4] Plaintiffs also assert a First Amendment violation pursuant to Section 1983. Although the Second Circuit has not directly applied the *Williamson* test to First Amendment claims emanating from land use disputes, the Second Circuit has recognized certain circumstances where such claims should be subject to the "final decision" determination (prong one). *See Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 350 (2d Cir. 2005) (applying *Williamson* prong-one ripeness test to First Amendment claim where there was no immediate injury to plaintiff). In the instant case, the Court does not find there to be any immediate alleged injury to plaintiffs, as discussed more in-depth below. Therefore, in the absence of any alleged actual, concrete injury, plaintiffs' First Amendment claim is subject to the same "final decision" analysis as plaintiffs' due process and equal protection claims pursuant to Section 1983.

In *Murphy*, the Second Circuit explained the considerations underlying prong-one ripeness – namely, the "final decision" requirement:

> Four considerations, all of which motivate our decision today, undergird prong-one ripeness. First . . . the *Williamson County* Court reasoned that requiring a claimant to obtain a final decision from a local land use authority aids in the development of a full record. . . . Second, and relatedly, only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel. . . . Third, a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes. Thus, requiring a meaningful variance application as a prerequisite to federal litigation enforces the long-standing principle that disputes should be decided on non-constitutional grounds whenever possible. . . . Finally, since *Williamson County,* courts have recognized that federalism principles also buttress the finality requirement. Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.

*Murphy,* 402 F.3d at 348-49 (citations omitted). As the Second Circuit has noted, "[t]he *Williamson County* ripeness test is a fact-sensitive inquiry that may, when circumstances warrant, be applicable to various types of land use challenges." *Id.* at 350.

Defendants contend that plaintiffs' claims are not ripe for review because the Village has not yet reached a final decision with regard to plaintiffs' applications, either for a variance or with regard to plaintiffs' desire for site plan approval for the commercial building plan. Instead, the Planning Board has issued a positive declaration pursuant to SEQRA. Defendants argue that a final decision cannot be reached until plaintiffs submit an EIS pursuant to SEQRA. The law is well-settled in New York that a positive declaration pursuant to SEQRA is not a final agency decision that is reviewable under New York Law. *See, e.g., N.Y. S.M.S.A. Ltd. P'ship v. Town of Riverhead Town Bd.*, 118 F. Supp. 2d 333, 342 (E.D.N.Y. 2000); *see also Sour Mountain Realty, Inc. v. N.Y. State Dep't of Envtl. Conservation*, 260 A.D.2d 920, 921 (N.Y. Sup. Ct. 1999), *appeal denied*, 93 N.Y.2d 815 (1999). Plaintiffs concede that the Village has not issued a final decision, but instead argue that proceeding with the SEQRA process would be futile.[5]

---

[5] Although plaintiffs argue that they "already suffered a definitive, actual and concrete injury," (Pls.' Opp., at 16), plaintiffs do not allege any injury suffered. See *Williamson*, 473 U.S. at 193 (holding that a final decision is a "definitive position on the issue that inflicts an actual, concrete injury"). In fact, as discussed above, a Positive Declaration pursuant to SEQRA is not a final definitive position. The alleged delay and cost to plaintiffs in submitting an EIS under SEQRA is insufficient in the context of this case to constitute such an injury. Therefore, since it is clear that the Planning Board has not issued a final decision, plaintiffs cannot argue that they have suffered any actual and concrete injury.

8

The Court of Appeals has recognized a "futility exception" to the "final decision" requirement. *Southview Assocs., Ltd.*, 980 F.2d at 98. "Under this exception, certain procedures that a plaintiff normally would be required to pursue in order to receive a final determination may be excused if the plaintiff can demonstrate, by more than mere allegations, that they would be futile." *Honess 52 Corp.*, 1 F. Supp. 2d at 301 (citing *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1501 (9th Cir. 1990)); *see also Murphy,* 402 F.3d at 349 ("[T]he finality requirement is not mechanically applied. A property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile. That is, a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied."). The Second Circuit has not yet determined "what the precise contours of the futility exception are." *RKO Del., Inc. v. City of New York*, No. CV002592 (DGT), 2001 U.S. Dist. LEXIS 17644, at *10 (E.D.N.Y. Aug. 28, 2001) (slip op.). However, as the *RKO* court observed,

> [o]ther circuits have adopted a narrow interpretation of the exception. The First Circuit has stated that "a sort of inevitability is required; the prospect of refusal must be certain." *Goldfine v. Kelly*, 80 F. Supp. 2d 153, 159 (S.D.N.Y. 2000) (quoting *Gilbert v. City of Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991)). The Ninth Circuit has held that "mere allegations by a property owner that it has done everything possible to obtain acceptance of a development proposal will not suffice to prove futility." *Id.* (quoting *Herrington v. County of Sonoma*, 857 F.2d 567, 570 (9th Cir. 1988)). . . . Other factors considered by courts in applying the exception are the defendant's hostility, delay and obstruction. *See id.* 80 F. Supp. 2d 153, 160. However, since in *Williamson* the claim was not found ripe despite an eight-year application process, "an excessive delay would have to be considerable." *Id.* at 161 (quoting *Kinzli*, 818 F.2d at 1454 n.5).

*Id.* at *10-*11; *see also Kittay*, 112 F. Supp. 2d at 349 ("While the Second Circuit has yet to define the exact contours of [the futility] exception, other Circuits have interpreted the futility exception far more narrowly than what plaintiff proposes.").

A plaintiff can successfully invoke the futility exception where it filed at least one "meaningful application." *RKO*, 2001 U.S. Dist. LEXIS 17644, at *12; *Kittay*, 112 F. Supp. 2d at 349-50. However, under certain circumstances, courts have required more than one rejected application to invoke the futility exception. For example, in *Southview Associates*, the Second Circuit refused to apply the futility exception to the final decision requirement where the plaintiff had submitted, and had been denied, only one application for a land-use permit. *See Southview Assocs.*, 980 F.2d at 98 ("Southview has submitted, and the Board has denied, only one application for an Act 250 permit. The Board's rejection of Southview's 33-unit subdivision proposal in no way precludes Southview from submitting another proposal, and it is 'not clear whether the [Board will] deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property.'") (quoting

9

*Williamson,* 473 U.S. at 187); *see also Xikis v. City of New York*, No. CV 89-2000 (ADS) 1990 WL 156155, at *4 (E.D.N.Y. Sept. 28, 1990) (holding that plaintiff must seek a variance after denial of his application for re-zoning of his property before the case will be ripe).

In the instant case, plaintiffs cannot even argue that they made, and were denied, a meaningful application with respect to their development plan. Instead, as set forth in the complaint, the Planning Board simply adopted a positive SEQRA declaration, which required plaintiffs to submit an EIS regarding the environmental impact of the proposed development. Plaintiffs, instead, argue that to proceed with the SEQRA process and endure such an expensive and lengthy delay only to have their project ultimately rejected at the end of the day, based on defendants' hostility to the proposal, would be futile. (Pls.' Opp., at 16.) Specifically, plaintiffs point to the alleged hostile comments made by defendant Motz evidencing his allegedly unlawful intent to ensure that the plaintiffs' projects never garner approval, coupled with the defendants' actions surrounding the application of the SEQRA process. (*Id.*)

However, courts in this Circuit have recognized that "mere allegations of open hostility [are] not sufficient to invoke the futility exception." *Goldfine*, 80 F. Supp. 2d at 160-61; *see also Dix v. City of New York*, No. 01 CIV. 6186 (LAP), 2002 WL 31175251, at *8 (S.D.N.Y. Sept. 30, 2002) (finding facts inadequate to support the futility exception, where defendants acted with hostility towards plaintiffs and attempted to delay or discontinue plaintiffs' permit application through written letters and participation in hearings); *Tri-State Video Corp. v. Town of Stephentown*, No. 97 CV 965, 1998 WL 72331, at *4 (N.D.N.Y. Feb. 13, 1998) (finding that "mere unsupported conclusory allegations that the [defendant] is openly hostile to its position [are] not sufficient to invoke the futility exception"); *Xikis,* 1990 WL 156155, at *6 (rejecting plaintiff's futility claim and finding that hostility towards the plaintiff's re-zoning application does not necessarily mean that an application for a zoning variance would be opposed). Moreover, the *Goldfine* court held that the hostility allegations were "insufficient to show that the 'prospect of refusal is certain.'" 80 F. Supp. 2d at 161 (citation omitted); *accord Dix*, 2002 WL 31175251, at *8. Similarly, conclusory assertions that bad faith or malicious intent is the basis for a Board's actions are insufficient to justify invoking the narrow futility exception. *See, e.g., Country View Estates @ Ridge LLC,* 452 F. Supp.2d at 154 (collecting cases).

In the instant case, plaintiffs point to the hostility exhibited by Motz. Specifically, plaintiffs cite to his statements that no project of the plaintiffs was "happening in our town," "we are not like *you people* from Westhampton," and for plaintiffs to "move on." Plaintiffs further point to allegations of resistance by the Board at meetings to accept Lettieri's ideas, as well as pressures by Motz to have the property owner sell the property to someone else.

This sort of alleged hostility is similar to that which was rejected by the court in both *Goldfine* and *Dix*. In *Goldfine*, not only did the defendant allegedly fail to show up for site visits and misinterpret the regulations in order to make the development more difficult, but the plaintiff also met "strong opposition" at early Planning Board meetings (meetings that the defendant attended). 80 F. Supp. 2d at 156. The *Goldfine* court found that those allegations were insufficient to show that "the prospect of refusal is certain." *Id.* at 161.

Similarly, in *Dix*, the plaintiff alleged that the defendants issued a Stop Work order, harassed and intimidated contractors at premises, and interfered with the well-established process. 2002 WL 31175251, at *8. The *Dix* plaintiff also alleged disparate treatment and further relied upon statements made by defendants during the application process. *Id.* The *Dix* court found these allegations to be similar to those that were rejected in *Goldfine* and inadequate to satisfy the futility exception. *Id.*

The facts in the instant case are similar to those cases where futility claims have been rejected and the Court agrees with the analysis in those cases. Specifically, similar to *Dix*, the Court concludes that plaintiffs' allegations even if true – including claims of disparate treatment based on alleged statements by Motz and the alleged resistance by the Board – are insufficient to satisfy the futility exception. Although such allegations (assuming they are true) reflect hostility to plaintiffs' proposal by the Mayor and possibly others within the Village, they are insufficient to show that the Village has "dug in its heels" to such extent that it is clear that all such applications and proposals will be denied. For example, after additional submissions to the Planning Board and the BZA, Motz could change his mind regarding the proposal or, regardless of Motz's negative views, the Planning Board or the BZA could approve the proposal. *See, e.g., Miljan v. Village of Grayslake, Illinois,* No. 00 C 7428, 2001 WL 1035729, at *3 (N.D. Ill. Sept. 7, 2001) (finding Section 1983 claims relating to temporary use permits for weapons at fairground were not ripe for judicial review and concluding that "[p]laintiff's claims that the Mayor has a 'personal agenda to eliminate gun shows' [are] insufficient to support a futility argument"); *Xikis,* 1990 WL 156155, at *6 (finding plaintiff's claims premature and rejecting argument "that seeking a zoning variance would be 'futile' because the Board and the Community Board 'are openly hostile to the commercial use of the plaintiff's property'") (citation omitted). Therefore, plaintiffs' allegations do not come close to establishing that any further compliance with the process by plaintiffs will be futile.[6] Moreover, despite plaintiffs' conclusory arguments to the contrary, the Court is unpersuaded that there is evidence that delayed judicial review would cause an undue hardship to the plaintiffs.

---

[6] In countering the futility argument by plaintiffs, defendants also note that the administrative process is ongoing. Specifically, in a letter to the Court dated May 28, 2008, the defendants advised the Court as to the status of plaintiffs' pending applications within the Village of Quogue: "The Mayor advises that the Quogue Village Board has scheduled a public hearing for June 27, 2008, concerning a proposed amendment to the Village Code based upon the plaintiff's revised residential building plan – a modification by the plaintiff of the prior residential plan that was pending before the Village Board and the BZA at the time of the inception of this lawsuit." (Defs.' Letter to the Court, dated May 28, 2008.) Plaintiffs argue that the Court should not consider these developments because they are "settlement discussions." (Pls.' Letter to the Court, dated May 30, 2008.) The Court disagrees with plaintiffs' characterization of these recent developments as impermissible evidence of settlement discussions; rather, these are simply factual reports of what has transpired in the administrative process relating to the subject matter of this litigation. For example, the scheduling of a public hearing is hardly a "settlement discussion" on which the Court cannot rely. In any event, even if the Court does not consider any of these recent developments which provide additional support for the lack of futility, plaintiffs' allegations in the complaint are insufficient to establish futility for the reasons discussed above.

To the extent plaintiffs also argue that defendants' delay also requires an application of the futility exception, this Court disagrees. Plaintiffs filed the complaint in this action in October 2007, which was slightly over one year from when plaintiffs first met with Motz in September 2006. The Supreme Court, as well as courts in this Circuit, have found delays of much greater magnitude to be insufficient to invoke the futility exception. *See, e.g., Williamson*, 473 U.S. at 199 (finding that claim was not ripe despite an eight-year application process); *Goldfine*, 80 F. Supp. 2d at 161 (finding that claim was not ripe despite a three-year application process). There is no basis from a review of plaintiffs' allegations to suggest that there has been sufficient delay in the consideration of their proposals to warrant application of the futility exception.[7]

In sum, this situation is far from being futile. Plaintiffs filed an application and the Planning Board issued a positive declaration pursuant to SEQRA, an interim decision which requires plaintiffs to submit an EIS. Although plaintiffs sense strong hostility to the proposal based upon alleged comments by Motz and others, it would still be premature for this Court to circumvent the agency process and make a determination without an ultimate decision by the Planning Board. *See Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) (concluding that the Court must be "mindful of the general proscription that federal courts should not become zoning boards of appeal") (citation omitted). The Court finds that the allegations of hostility and delay do not warrant applying the futility exception here.[8] Accordingly, plaintiffs' Section 1983 claims are dismissed without prejudice.[9]

---

[7] Defendants argue that plaintiffs caused the delays in consideration of their proposals by, among other things, adjourning the proceedings before the BZA on at least five occasions. (Defs.' Mem., at 19.) The Court need not resolve this factual issue because (as noted above), assuming the truth of all of plaintiffs' allegations, there has not been sufficient delay to support a finding of futility in this case.

[8] Although plaintiffs cite a variety of cases in support of the application of the futility exception to the ripeness rule, the Court does not find them applicable to the facts of this case. *See, e.g.*, *Sunrise Dev. Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 770-71 (E.D.N.Y. 1999) (challenging validity of zoning law enacted one day after plaintiff submitted a fully conforming application with the then-existing zoning code); *Honess 52 Corp.*, 1 F. Supp. 2d at 301 (invoking futility exception where stipulation existed between the parties and court found that approval will not be forthcoming prior to the expiration of plaintiff's rights under the stipulation).

[9] Given that the Court has dismissed plaintiffs' Section 1983 claims on grounds that they are not yet ripe, the Court need not address defendants' arguments with respect to these claims that: (1) the plaintiffs have failed to state a claim under Rule 12(b)(6); and (2) the defendants are entitled to qualified immunity.

Moreover, defendants also move to dismiss plaintiffs' claim pursuant to 42 U.S.C. § 1985. Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . [and] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured . . . may have an

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss pursuant to 12(b)(1) is GRANTED in its entirety. The Section 1983 claims and Section 1985 conspiracy claim are dismissed without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 14, 2008
Central Islip, NY

\* \* \*

The attorney for the plaintiffs is Andrew J. Campanelli, Esq., of Perry & Campanelli, LLP, 129 Front Street, Mineola, NY 11501. The attorney for the defendants is David H. Arntsen, Esq., of Devitt Spellman Barrett, 50 Route 111, Smithtown, NY 11787. The attorney for defendant Van de Kieft is Jarrett M. Behar, Esq., of Sinnreich Safar & Kosakoff LLP, 320 Carleton Avenue, Suite 3200, Central Islip, NY 11722.

---

action for the recovery of damages occasioned by such injury or deprivation . . .

42 U.S.C. § 1985(3). Section 1985(3) "provides no substantive rights itself but merely 'provides a remedy for violation of the rights it designates.'" *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) (quoting *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979)). Here, plaintiffs' Section 1985 conspiracy claim relies upon the same alleged constitutional violations found to be not ripe for purposes of Section 1983. Therefore, the Court also finds that the Section 1985 conspiracy claim is not ripe for review and must be dismissed without prejudice.